IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                                                       CR No. 01-1244 MV

ADALBERTO NAVA-SOTELO,
aka ROBERT MONTOYA,

        Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** comes before the Court on Defendant's Objections to Presentence Report **[Doc. No. 23]** and Sentencing Memorandum and Motion for Downward Departure **[Doc. No. 24]**. The Court, having considered the objections, motion, briefs, relevant law and being otherwise fully informed, ruled at the sentencing hearing that the objections and motion would be **GRANTED in part and DENIED in part**. The Court now sets forth the bases for its prior ruling in this Memorandum Opinion.

**BACKGROUND**

Defendant has pleaded guilty to a Six-Count Information **[Doc. No. 17]**, charging kidnapping of an officer or employee of the United States while in the performance of official duties; assault on an officer or employee of the United States while in the performance of official duties; possession, use and discharge of a firearm during a crime of violence; and instigating or assisting an escape of a federal inmate. Defendant duly executed a Waiver of Indictment **[Doc. No. 19]** and waived his right to prosecution by indictment.

The sequence of events that led to this sentencing is tragic, to say the least.  On the morning of May 8, 2001, Defendant participated in the attempted escape of his older brother, Oswaldo Nava-Sotelo, from federal custody at a dental clinic where he had just undergone oral surgery.  Various facts concerning these events are in dispute and will be discussed at length later in this opinion.  However, it is not disputed that Defendant and his brother left the dental clinic in separate vehicles—Defendant in the truck that he drove from his home in Mexico, and his brother in a corrections transport van with two correctional officers inside.

Law enforcement officers subsequently pursued the brothers on Interstate 10, at which time Oswaldo Nava-Sotelo killed himself with a firearm while driving the transport vehicle.  The correctional officers, locked in the back of the van during the shooting, did not sustain serious physical injuries, though they were traumatized by the events.  Defendant himself was apprehended by law enforcement officials after striking a pole while crossing the median of the interstate.

After reviewing the Presentence Report ("PSR") prepared by the U.S. Probation Office ("USPO"), Defendant filed his Objections to the Presentence Report **[Doc. No. 23]** and Sentencing Memorandum and Motion for Downward Departure **[Doc. No. 24]**, in which he (1) disputed certain factual statements in the PSR, (2) objected to enhancements for reckless endangerment and official victim, (3) requested a reduction for minor role, (4) argued for a seven-year consecutive sentence for brandishing a firearm, rather than a ten-year consecutive sentence for discharging a firearm, and (5) moved the Court to depart downward from the sentencing guidelines on the basis of family circumstances, incomplete duress, post-offense rehabilitation, super-acceptance of responsibility, lack of personal benefit, community support, exceptional remorse, and a totality of the circumstances.  The

government subsequently filed its responses to Defendant's objections and motion **[Doc. Nos. 29, 30]**.

The Court held an exhaustive three-day evidentiary hearing on May 21–23, 2002, which addressed the issues raised by Defendant in his Objections and Sentencing Memorandum.  Due to the lack of time, the Court permitted counsel to submit their closing arguments in writing **[Doc. Nos. 37 & 38]**.  On October 21, 2002, the Court granted a two-level enhancement for reckless endangerment while fleeing from law enforcement officials and a three-level enhancement because Defendant knew that the victims were correctional officers.  The Court denied Defendant's request for a minor role adjustment, but granted a six-level downward departure for a combination of factors, as set forth below.  The Court also imposed a seven-year consecutive sentence for brandishing a firearm, resulting in a final sentence of 121 months.

## DISCUSSION

### I.    Objections to Factual Statements in PSR

Defendant makes the following objections to factual statements in the Cover Page, Offense Conduct and Acceptance of Responsibility sections of his PSR:  (1) Defendant's only aliases are Robert Montoya and El Guero;[1] (2) Defendant denies placing a weapon to Dr. Almeida's head, pointing a weapon at Mr. Franco as he went around the van, and intentionally shooting the firearm; (3) Defendant denies pulling Dr. Almeida out of the van, but rather insists that he motioned for him to get out; (4) Oswaldo Nava-Sotelo ordered Dr. Almeida and Mr. Franco to lie down in the transport vehicle; (5) Defendant only ordered the victims to throw the radio and keys to the ground;

---

[1]The Court notes that "El Guero" is an affectionate nickname for fair-skinned persons in Mexico, similar to the term "Blondie."

(6) Defendant argues that he drove in the wrong direction on the shoulder of the westbound lane of Interstate 10 rather than inside the lane itself; and (7) Defendant spent the night in Juarez on the evening of May 7, 2001, and crossed the bridge into El Paso the following morning to drive to the dental clinic.

The government does not oppose Defendant's objections with regard to his aliases and where he was on the evening of May 7, 2001. Therefore, the PSR should be modified to reflect the changes requested by Defendant regarding these factual statements.

More difficult to resolve are the other objections made by Defendant. It seems that the PSR relied primarily on the government's case file in its Offense Conduct section despite Defendant's assertions to the contrary. Although Defendant pleaded guilty to the charges in the Information, he did not concede to all of the facts contained in the government's version of events. Thus, it was improper for the PSR solely to present the government's version in determining Defendant's offense conduct, especially since the facts were disputed, no evidentiary hearing had taken place, and the Court had not yet made any findings with regard to the disputed facts. The Offense Conduct should have contained both the government's and Defendant's perspectives, rather than giving the impression that the government's account was the only accurate version of events. This is especially true given the inconsistencies in the testimony of several of the government's witnesses during the May evidentiary hearing, upon which the PSR relied. The Court notes that the USPO's Fourth Addendum recognizes the inconsistencies in the government's evidentiary presentation.

Because the remaining objections by Defendant touch upon legal issues to be examined later in this opinion, the Court will discuss the evidentiary inconsistencies and make its factual findings when it addresses the other issues raised in Defendant's Objections and Sentencing Memorandum.

**II.     Enhancements to Base Offense Level**

The government has the burden to prove by a preponderance of the evidence any enhancement to Defendant's base offense level.  *See United States v. Conley*, 131 F.3d 1387, 1390 (10th Cir. 1997).  The government requests the Court to impose a two-level enhancement for reckless endangerment and a three-level enhancement for official victim.  As further explained below, the Court finds both enhancements to be appropriate in this case.

      A.     <u>Two-Level Enhancement for Reckless Endangerment</u>

The sentencing guidelines provide for a two-level enhancement "[i]f the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer . . . ."  U.S. Sentencing Guidelines Manual ("USSG") § 3C1.2 (2001).  "Reckless" is defined as:

> [A] situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation.

USSG § 2A1.4, appl. n.1 (2001), *cited in* USSG § 3C1.2, appl. n.2 (2001).  For purposes of applying Section 3C1.2, "'reckless' means that the conduct was at least reckless and includes any higher level of culpability."  USSG § 3C1.2, appl. n.2.  "[T]he standard of care envisioned by the Guidelines is that of a reasonable person, not the reasonable fleeing criminal suspect."  *Conley*, 131 F.3d at 1390.

Defendant argues that a two-level enhancement for reckless endangerment is not appropriate in this case because he led a low-speed chase on the interstate, took precautions against endangering others by flashing his lights and avoiding traffic, and at no time traveled eastbound on the westbound lane of Interstate 10, but rather stayed in the shoulder of the westbound lane.  On the other hand, the

-5-

government contends that Defendant's speed ranged from 25 to 75 miles per hour, that Defendant continued to drive his vehicle even though at least one of his tires had become completely deflated, and that he definitely crossed the median into oncoming traffic in the westbound lane.

This is one of the situations where the PSR relied on the government's account of events, which later appeared inconsistent during the evidentiary hearing. In his report, Agent Llamas stated that he was "behind the vehicle and heading east on the west-bound side of I-10 but was only on the shoulder. At no time was I ever on the pavement, and I was always at a safe distance," when referring to his pursuit of Defendant on the westbound lane. (Def. Ex. 165.) However, in his testimony at the hearing, Agent Llamas recanted the statement in his report after testifying that Defendant must have entered the westbound lane where there was no shoulder on which to travel. (R. at 59–64.) Thus, if Defendant was forced to enter the westbound lane, Agent Llamas must have likewise entered the westbound lane as he was pursuing Defendant.

Additionally, Agent Llamas initially testified that Defendant's two driver's side tires and the rear passenger side tire were deflated. (R. at 54.) However, Agent Llamas later stated that Defendant's two front tires and only the driver's side rear tire were deflated. (R. at 55.) It is unclear from the evidence submitted exactly how many tires were deflated, but a photograph submitted by the government indicates that at least one tire was shredded to its rim. (Gov't Ex. 1.)

According to Officer Credeur's testimony, Defendant drove at erratic speeds from 20 to 85 miles per hour while the posted speed limit was 70 miles per hour. (R. at 13.) Moreover, Officer Credeur testified that Defendant was straddling the lanes and later crossed the median to drive in the wrong direction into congested traffic. (R. at 13–18.) However, the videotape of the pursuit, submitted by the government, does not support all of Office Credeur's characterizations of

Defendant's driving.  (Gov't Ex. 2.)  Defendant at all times appeared to be driving within the speed limit and using all of the necessary precautions of a responsible driver, including the use of his turn signal.  Although it is apparent that his tires were deflated, most of the cars traversing the interstate had pulled over to the shoulder at that time.  Unlike other pursuits, which often involve high-speed chases and deliberate attempts to hit other vehicles or individuals, Defendant did not appear to endanger the lives of anyone, including the officers in pursuit, before he entered the westbound lane. The Court does not believe that any of Defendant's actions at this point of the pursuit would have justified a two-level enhancement.

Nevertheless, when Defendant crossed the median and began traveling in the wrong direction of the interstate, he necessarily created a substantial risk of serious bodily injury to others, and such action was reckless.  From the videotape, it appears that Defendant must have at least partially entered the westbound lane due to a lack of space on the shoulder area.  However, irrespective of whether Defendant actually entered the interstate lane, a reasonable person would not drive into oncoming traffic, even if only on the shoulder of the road, without realizing the needless risk of injury to others.  Defendant has admitted that driving on deflated tires and crossing the interstate median were both unsafe and reckless.  (R. at 520–23.)  The Court finds, therefore, that the government has met its burden of proof with regard to the enhancement for reckless endangerment in the course of fleeing from a law enforcement officer.

B.    Three-Level Enhancement for Official Victim

An enhancement under the guidelines is applicable if:

> during the course of the offense or immediate flight therefrom, the
> defendant or a person for whose conduct the defendant is otherwise
> accountable, knowing or having reasonable cause to believe that a

> person was a law enforcement or corrections officer, assaulted such
> officer in a manner creating a substantial risk of serious bodily injury.

USSG § 3A1.2(b) (2001).  Moreover, the application notes provide:

> While this subdivision may apply in connection with a variety of
> offenses that are not by nature targeted against official victims, its
> applicability is limited to assaultive conduct against law enforcement
> or corrections officers that is sufficiently serious to create at least a
> "substantial risk of serious bodily injury" and that is proximate in time
> to the commission of the offense.

USSG § 3A1.2(b) appl. n.5 (2001).

Defendant argues that this enhancement is not applicable to the crime of kidnapping and further asserts that Dr. Almeida was not a correctional officer, but rather a medical technician and, thus, is not subject to this provision.  The Court finds both arguments to be unavailing.

Defendant has pleaded guilty to two counts of assaulting an officer or employee of the United States; therefore, it is undisputed that Defendant assaulted Officer Franco and Dr. Almeida during the commission of his offenses.  Moreover, during the assault, Defendant brandished and accidentally discharged a firearm, which created a "substantial risk of serious bodily injury."  Therefore, whether the enhancement applies to the kidnapping charges is irrelevant.

Finally, it is clear from the testimony that Defendant knew or had reasonable cause to believe that both Officer Franco and Dr. Almeida were federal correctional officers.  Defendant himself stated that he thought Officer Franco was a correctional officer and that Dr. Almeida was his "helper."  (R. at 548.)  Thus, while one may argue that Dr. Almeida did not appear to be a correctional officer since he was dressed as a medical assistant, Defendant himself admitted that he knew Dr. Almeida was, in fact, assisting Officer Franco.  It has further been demonstrated that both Officer Franco and Dr.

Almeida were employed as correctional officers.  As a consequence, the government has satisfied its burden of establishing the applicability of this three-level enhancement.

## III.    Consecutive Sentence for Firearm Offense

The government argues that Defendant is subject to a ten-year consecutive sentence for discharging his firearm—a charge to which he pleaded guilty in Count V of the Information. Defendant, on the contrary, contends that he should receive a seven-year, rather than a ten-year, consecutive sentence for *brandishing* a firearm because the discharge of the firearm was accidental and involuntary.

The federal criminal code provides in pertinent part that "any person who, during and in relation to any crime of violence . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment" for the underlying offense, be sentenced to a mandatory consecutive sentence.  18 U.S.C. § 924(c)(1)(A)(i) (West 2000).  The minimum consecutive sentence is seven years for brandishing a firearm, and ten years for discharging a firearm.  18 U.S.C. § 924(c)(1)(A)(ii)–(iii) (West 2000).

In support of the ten-year consecutive sentence, the government refers to Count V of the Information, which specifically cites Section 924(c)(1)(A)(iii) and its provision for a ten-year consecutive sentence.  However, the U.S. Supreme Court recently held that Section 924(c)(1)(A) is a single offense for which the brandishing or discharge of a firearm is a sentencing factor to be determined by the district judge.  *See Harris v. United States*, 122 S. Ct. 2406 (2002).  Therefore, it is for the Court to decide whether a seven or ten-year consecutive sentence is appropriate in this case, regardless of the specific statutory provision cited in the Information.

It is undisputed that Defendant brandished a firearm when he approached Officer Franco and Dr. Almeida.  From the testimony provided by Defendant, Officer Franco, and Dr. Almeida, it is clear that the gun discharged during the struggle between Defendant and Officer Franco.  Yet, the government has not presented any evidence that indicates Defendant discharged the firearm voluntarily and intentionally.  On the contrary, it seems apparent that the gun accidentally discharged as both Defendant and Officer Franco attempted to gain control of it.

Moreover, despite the statements in the PSR that Defendant pointed the firearm towards the victims and that he chambered a round, such assertions were not convincing at the evidentiary hearing.  For example, Officer Franco testified at the evidentiary hearing that Defendant was alternatively pointing the gun towards Dr. Almeida and himself prior to the struggle.  (R. at 216–17, 220.)  However, in a taped interview, Officer Franco stated that Defendant was "holding his weapon, pointing it toward the ground" when he approached Defendant.  (R. at 256; Def. Ex. 166 at 2.)  Additionally, in response to the question of where the gun was pointed, Officer Franco responded in his interview, "He had it pointed like towards—I guess at waist level, but had the barrel facing down."  (R. at 258; Def. Ex. 166 at 9.)  When asked whether Defendant pointed the gun towards him or Dr. Almeida during the struggle, Officer Franco responded, "No, huh-huh.  Mr. Almeida was nowhere, to my knowledge, in the line of fire anywhere. . . .  It was actually me and the subject that were actually facing each other when this happened.  When I grabbed his wrist, I—uh, kept the weapon pointed down."  (R. at 259; Def. Ex. 166 at 12.)  Nowhere in the report does Officer Franco state that the gun was pointed towards him or Dr. Almeida.  The report was a taped statement to Officer Monget of the Las Cruces Police Department, made by Officer Franco on the date of the offense.  During the evidentiary hearing, Officer Franco did not provide sufficient reasons to explain

the discrepancy in his testimony as compared to his prior statements.  As a consequence, the Court does not find Officer Franco's testimony to be credible on this issue.

The Court also does not find credible Dr. Almeida's testimony with regard to Defendant placing a gun to his head.  Dr. Almeida testified that Defendant "opened the door, and he pulled me down out of the van, without removing the weapon from my neck." (R. at 159.)  Yet, even though the government asked how Defendant could pull him out of the van when Defendant had one hand on the gun and the other hand on the van door, Dr. Almeida continued to state that Defendant "pulled me completely out of the van." (R. 159–60.)  Moreover, Dr. Almeida testified that Defendant pointed the gun towards his abdominal area (R. at 160), which directly contradicts Officer Franco's taped statement that Defendant was "holding his weapon, pointing it toward the ground" when he approached Defendant and that "Dr. Almeida was nowhere, to my knowledge, . . . in the line of fire anywhere" prior to the struggle.  (R. at 256–59; Def. Ex. 166.)  The Court notes that both Officer Franco and Dr. Almeida admitted to having discussed the facts of this case with each other within a few weeks before their testimony in court, thereby further tainting their credibility.[2]  (R. at 190, 233–35.)

Similarly, the Court did not find the government's witness, Elizabeth Saenz, to be credible.  Ms. Saenz was in the courtroom during the testimonies of Officer Stewart, the FBI case agent, and Dr. Almeida, and clearly understood that Defendant's use of the firearm was a critical issue in dispute. (R. at 284.)  Moreover, Ms. Saenz was inconsistent in her testimony, stating in a previous interview that she observed Defendant enter the van with his brother before their departure even though it has

---

[2]The Court notes that while Dr. Almeida admitted to having discussed the facts of this case on the day of the evidentiary hearing (R. at 190), Officer Franco stated that they had not done so (R. at 233–35).

-11-

now been firmly established that Defendant left separately in his own vehicle.  (Def. Ex. 167; R. at 322.)  Ms. Saenz was further inconsistent in testifying that she saw Defendant wave the gun toward the victims (R. at 313; 332), although she previously stated in an interview that she did not see which way the firearm was pointed when Defendant approached the victims and when the firearm discharged (R. at 329–33).

On the contrary, Defendant has been consistent in his account of events to law enforcement officials and during the evidentiary hearing.  His apparent honesty is further bolstered by the fact that during the evidentiary hearing, Defendant sometimes answered to his own detriment in order to state the truth, as in his concessions with regard to the facts that established the applicability of the reckless endangerment and official victims enhancements.  (R. at 520–23, 548.)  While the Court notes that Defendant fabricated his story and identity in his initial interaction with law enforcement officials, it believes Defendant's contention that the purpose of such actions was to protect his brother and that he has fully and truthfully disclosed his involvement in the offenses since his discovery of his brother's death.  Of particular note is the opinion of the FBI case agent assigned to this case that "the fact that [Defendant] had given a statement substantially different than what he explained at the debrief earlier" did not "affect [his] assessment of [Defendant's] credibility at the debrief."[3]  (R. at 583.)

_____

[3]The Court notes, however, that it did not find the FBI case agent's testimony to be credible or competent throughout the evidentiary hearing.  A prime example is the case agent's statement under oath that Defendant's testimony was *consistent* with that of the government's witnesses regarding the discharge of the firearm.  (R. at 630–31.)  This comment led to some confusion because one of the key issues of the hearing was the *inconsistencies* among the various testimonies.  Subsequently, the government requested to question the case agent again to clarify the obvious confusion and asked, "Is what they [the victims and the dental assistant] saw and told you what they saw [sic] the same as what Mr. Nava said happened?"  He replied, "What they said the same as what Mr. Nava told me?  Yes."  (R. at 633–35.)

With consideration of all of the evidence presented, the Court finds that Defendant did not pull Dr. Almeida out of the transport vehicle, did not point his firearm towards the victims, and did not intentionally discharge the firearm. The PSR's Offense Conduct should reflect the Court's rulings accordingly. Additionally, the Court finds that it would be inappropriate to give Defendant a ten-year enhancement for an action that was accidental and involuntary. The Court will, however, impose a seven-year consecutive sentence because Defendant brandished the firearm during the offenses.

## IV.    Reduction for Minor Role

According to the guidelines, a two-level reduction for minor role is warranted for "a defendant who is less culpable than most other participants, but whose role could not be described as minimal." USSG § 3B1.2 appl. n.5 (2001).

Defendant argues that this two-level reduction is applicable to Counts I and II of the Information due to his minor role in the kidnapping of the victims. By comparison, he asserts that the involvement of Oswaldo Nava-Sotelo was much greater, as he was the driver of the van that held the correctional officers.

In order to ascertain whether Defendant is "substantially less culpable than the average participant," it is necessary for the Court to know the level of culpability of the other participants. From the evidence presented thus far, any information regarding other participants in the escape attempt, other than Defendant's brother, is woefully lacking. Defendant has consistently stated that, pursuant to his brother's instructions, he met a man at the El Paso Bridge, who provided him with a bag that contained various items, including a firearm and handcuff keys, as well as instructions to leave the bag at the dental clinic where his brother would be the following day. Defendant described this man as white, with short white hair, a large mouth and nose, and pointed ears. (R. at 432.) He

-13-

further testified that the man was wearing a light gray shirt, gray pants, black shoes, a watch, and some rings.  (R. at 433.)  However, law enforcement officials did not believe Defendant's story because it did not provide any clues with which they could find a suspect.  (R. at 583–88.) Defendant's credibility was not tainted by the fact that he had previously lied, but rather from the fact that his information was not helpful.  (*Id.*)

While the Court defers to the judgment of law enforcement in determining the credibility of a debrief, it belies common sense that the veracity of a defendant's statement is dependent solely on its utility.  Yet, in this case, because Defendant provided facts that were "too specific" but unable to create leads (R. at 583), the FBI chose immediately to disbelieve Defendant's account and failed to corroborate his statements.  For example, the FBI case agent discovered the registered owner of the firearm used in the offense, but never interviewed him.  (R. at 610–12.)  The FBI determined that the registered owner gave the firearm to someone in Mexico, but did not follow up to get a description of the new owner in order to establish whether or not he was the same person whom Defendant met at the El Paso Bridge.  (R. at 610–12.)  Although the FBI case agent believed Defendant's assertion that the man at the bridge recognized Defendant from his visits to the La Tuna facility, he did not investigate who would have had the opportunity to see Defendant there.  (R. at 605.)  Indeed, at the time of the evidentiary hearing, the FBI had not even finished reviewing the contents of Defendant's truck to find items, such as a parking receipt, to confirm his contention that he parked near the bridge, although it had been over one year since the date of the offense.  (R. at 643–44.)  Moreover, the case agent admitted that he had not focused on the information provided by Defendant because Defendant had already pleaded guilty.  (R. at 633.)

It is clear that the escape attempt involving Oswaldo Nava-Sotelo required a great deal of planning and inside information, since very few people have knowledge of an inmate's medical visits outside of the correctional facility.  Surely, Defendant, who resided in a small village in Mexico, could not have gained access to such confidential information on his own, especially when his own brother would not have known when he would be transported.  Yet, despite every indication that Defendant was truthful in his answers, the FBI chose to cease investigating Defendant's story to determine its veracity.  As the case agent stated, there was no need to confirm Defendant's statements because his case was closed—he had already pleaded guilty.

Nevertheless, the burden rests with Defendant to prove eligibility for a role adjustment and, despite the troublesome uncertainties surrounding the investigation of this case, the Court has no evidence upon which to find Defendant less culpable than the average participant.  The only *known* participants in the charged offenses are Defendant and his brother.  While there is some disagreement as to whether it was Defendant or his brother who ordered the victims into the back of the van prior to the kidnapping,[4] it is not disputed that Defendant freed his brother and gave him access to a firearm.  Thus, assuming *arguendo* that Oswaldo, not Defendant, ordered the victims to lie down in the back of the transport van, Defendant's own actions contributed to his brother's access to a firearm, with which he held the victims hostage and took his own life.  Under such circumstances, the Court cannot find Defendant to be a minor participant in the kidnapping charges.

_____

[4]Again, the PSR reflects the government's version of events in which Defendant ordered the victims to lie down in the transport vehicle after releasing his brother, while Defendant argues that he merely ordered them to throw their radio and keys on the ground.  Defendant contends that his brother was the person who ordered them into the back of the vehicle.  Because the Court need not make a factual finding on this issue, it instead directs that the PSR be revised to reflect both the government and Defendant's characterizations of what happened.

**V.      Motion for Downward Departure**

Defendant moves the Court to depart downward from the sentencing guidelines based on family circumstances, incomplete duress, post-offense rehabilitation, super-acceptance of responsibility, lack of personal benefit, community support, exceptional remorse, and totality of the circumstances.  In its Fourth Addendum, the USPO recommends a six-level departure based on a combination of the following factors:  family circumstances; incomplete duress and lesser harms; and community support, and civic, charitable, and public service.  At the sentencing hearing, the Court agreed with the USPO's assessment and granted a six-level downward departure.

A.      Family Circumstances

According to the sentencing guidelines, "[f]amily ties and responsibilities . . . are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range."  USSG § 5H1.6 (2001).  Because family circumstances is a discouraged factor in granting a downward departure, the circumstances must be exceptional and extraordinary.

Defendant has been the primary caretaker of his elderly and sick parents and his disabled grandmother, who has been wheelchair-bound for at least the past eight years.  His father, who was diagnosed with severe arterial hypertension and hypertensive cardiopathy, has died during Defendant's incarceration.  His mother suffers from phlebitis in her left leg and fluid in her lungs due to complications associated with a tumor that was removed from her brain approximately eight to nine years ago.  Defendant has worked the land and fixed equipment on his family farm since he was a child and became primarily responsible for its operation in his adulthood, thereby providing the principal source of financial support for his parents and grandmother.  His sister, Liliana Nava-Sotelo, stated at the evidentiary hearing:

> The Guero [Defendant] was always the one who worked the land. He
> was the one who did the work. He did the planting, the corn and the
> beans. He even swept for us. And with my grandmother, well, she's
> in a wheelchair, and if my mama or [our sister] Maribel or I had to
> leave, he said, "I'll stay." He would bathe her and put her to bed.

(R. at 371.) Defendant continued to be the sole person to harvest the land and fix the machinery on

his parents' farm even after he moved two hours away to his new marital home, where he had his own

farm. The Court notes that in addition to his father, Defendant's mother-in-law has also recently

passed away, and his wife recently suffered a miscarriage.

While the Court recognizes that it is a sad but common occurrence for a defendant's family

to experience detrimental consequences from his or her incarceration, it is surely exceptional for

family members, completely dependent on a son's labor, to suffer from the loss of that labor while

also struggling with such severe disabilities as the inability to walk and complications from a brain

tumor. Such struggles are compounded by the additional loss of Defendant's father, his older

brother, his mother-in-law, and an unborn child. With these considerations, the Court believes

Defendant's extraordinary family circumstances warrants a departure from the sentencing guidelines.

B.   <u>Incomplete Duress and Lesser Harms</u>

The Sentencing Guidelines explicitly provide for a downward departure if coercion and duress

played a part in the defendant's commission of the offense:

> If the defendant committed the offense because of serious coercion,
> blackmail or duress, under circumstances not amounting to a complete
> defense, the court may decrease the sentence below the applicable
> guideline range. The extent of the decrease ordinarily should depend
> on the reasonableness of the defendant's actions and on the extent to
> which the conduct would have been less harmful under the
> circumstances as the defendant believed them to be.

-17-

USSG § 5K2.12 (2001).  The basis for departure has been characterized as "incomplete duress" because it "was meant to apply precisely to those situations where a complete defense was not present."  *United States v. Garza-Juarez*, 992 F.2d 896, 912 (9th Cir. 1993) (citations omitted); *see also United States v. Johnson*, 956 F.2d 894, 898 (9th Cir. 1992) ("Evidently the Commission had in mind the showing of duress less than what constitutes a defense to a crime; for if the defense were 'complete,' there would have been no crime requiring a sentence.").

> This ground for departure is broader than the defense of duress, as it does not require immediacy of harm or inability to escape, and allows the district court to consider the subjective mental state and personal characteristics of the defendant in its determination.

*United States v. Henderson-Durand*, 985 F.2d 970, 976 (8th Cir. 1993).  Moreover, in order to find incomplete duress, the Court need not find the offense to have been involuntary.  "[E]ven the complete criminal defense of duress assumes that the criminal act is performed voluntarily."  *Johnson*, 956 F.2d at 901.

The sentencing guidelines also state that "[o]dinarily coercion will be sufficiently serious to warrant departure only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party or from a natural emergency."  USSG § 5K2.12.  However, although "under ordinary circumstances, proof of injury or damage may be required," they need not be present under circumstances that are not ordinary.  *Garza-Juarez*, 992 F.2d at 912.

Defendant, his sister Liliana Nava-Sotelo, and Maria Isabel Yanez, common-law wife of Oswaldo Nava-Sotelo, testified about Oswaldo's influence over Defendant.  For example, Ms. Yanez stated that Oswaldo told her that "there are lots of ways that one can make others do what one wants,

without them even realizing it." (R. at 350.) It is clear from the evidence presented that Oswaldo Nava-Sotelo told his family that he would serve a five-year sentence for tax violations when, in fact, he was facing a twenty-two year sentence. (R. at 412–13.) As the five years were coming to an end, Defendant's father was even fattening a pig for the welcoming celebration. (R. at 417–19.) During this time, Defendant alone knew the reality of Oswaldo's true sentence and that his parents would probably never see his brother again. Defendant endeavored to get Oswaldo into a transfer program, whereby he could serve his sentence in Mexico and be closer to their parents. (R. at 415–16.) However, when Oswaldo was rejected from the program, circumstances seemed hopeless. (R. at 416–17.) Only a few months after Oswaldo learned of his rejection from the transfer program, he asked Defendant to assist him with his plans. (R. at 417.)

The psychological evaluation conducted on Defendant by Dr. Barry Hughes supports a finding of incomplete duress:

> The psychological factors in this case revolve not around mental illness but family roles and relationships. This is a very traditional, close-knit family. Oswaldo was a charismatic, intelligent and apparently, in some ways, favored child; the hopes and dreams of the family were heavily invested in him. He is uniformly described as influential and able to get people to do what he wanted in most circumstances. His younger brother Adalberto was, and still is to some extent, in awe of him.
>
> In contrast to Oswaldo, Adalberto was a loyal, if somewhat plodding son, fulfilling the family legacy of working the land. Since leaving school and going to work, his role has been to take care of his parents and extended family, his identity revolving around the security and happiness of those closest to him.
>
> His selection by Oswaldo as confidant put Adalberto in an intensely difficulty [sic] situation; torn by his two intense loyalties in a situation that had no good resolution. Both loyalties, toward his

parents and his brother, pushed in the same direction; toward doing what Oswaldo asked him to do.

Adalberto's loyalty toward his brother led him to make a commitment to helping even though he did not realize what he was committing to. His loyalty to his parents drove him to try to find a way to restore what he felt they needed most, the favored older son. Adalberto feels that if Oswaldo had specifically asked him to help him escape from the start, he would have refused. Once he had said he would help, his loyalty to his brother, and concern for his parents, made it much more difficult to not follow through with what he had been asked to do. Although Adalberto's behavior in response to these pressures was inappropriate, extreme, and ultimately devastating to both he [sic] and his family, it is difficult to conceive of him acting differently in response to this set of pressures.

The Court is persuaded by Dr. Hughes' evaluation and finds that the manipulation of Defendant by his brother amounted to incomplete duress. Oswaldo, while serving a twenty-two year sentence, specifically directed Defendant to continue the charade of his purported imminent release in order to avoid devastating health consequences for their ailing parents. In the meantime, he made comments like "[I]f I don't get out, I'm going to commit suicide inside" and that "he had to eat soup with rats and cockroaches," as well as discuss beatings and deaths in the prison facility, in order to gain sympathy for his predicament. (R. at 369–70; 559.) Defendant himself stated at the hearing, "Yes. I've been thinking that maybe he took advantage of my parents' situation, in order to make me help him." (R. at 472.) Yet, Defendant still commented, "[E]verything he did, if he manipulated me or not, he's my brother, and I will continue loving him, whether he tricked me or not." (R. at 473.)

The circumstances surrounding Defendant's involvement in his brother's attempted escape also support a downward departure based on "lesser harms," which is specifically mentioned as an encouraged factor in the sentencing guidelines:

-20-

> Sometimes, a defendant may commit a crime in order to avoid a perceived greater harm. In such instances, a reduced sentence may be appropriate, provided that the circumstances significantly diminish society's interest in punishing the conduct, for example, in the case of a mercy killing.

USSG § 5K2.11 (2001).

Section 5K2.11 also characterizes "lesser harms" as a situation in which "conduct may not cause or threaten the harm or evil sought to be prevented by the law proscribing the offense at issue." *Id.* However, this is a separate basis for departing due to "lesser harms"and is not necessary for a finding that a defendant committed a crime "to avoid a perceived greater harm.'" *United States v. Clark*, 128 F.3d 122, 124 (2d Cir. 1997) (quoting USSG § 5K2.11).

Upon this Court's review of the caselaw, it has not found many decisions addressing the application of Section 5K2.11. Indeed, one appellate court could not "find that any error on this ground is plain, given the dearth of caselaw on the application of the lesser harms provision in similar contexts and the deference owed to the district court's determination that a case falls outside a guideline's heartland." *United States v. Barajas-Nunez*, 91 F.3d 826, 832 (6th Cir. 1996) (citation omitted). In *Barajas-Nunez*, the district court departed from the guidelines due to the defendant's perception that "his girlfriend was in grave danger of physical harm and that he was responsible for making sure she received medical care." *Id.* Thus, the defendant in that case believed that his illegal reentry into the United States was a "lesser harm" than not assisting his girlfriend.

The First Circuit in *United States v. Carvell* also upheld a departure based on "lesser harms" where the defendant engaged in manufacturing marijuana as an alternative to suicide. 74 F.3d 8, 12 (1st Cir. 1996). Additionally, a district court granted a downward departure for a defendant who escaped from a federal penitentiary because, due to miscommunication through his interpreter, he

mistakenly believed that he would remain incarcerated indefinitely unless he paid a $10,000 fine. *See United States v. Saldana*, 1989 WL 61140 (M.D. Pa. May 19, 1989).

The Court believes that the case before it is substantially similar to the few opinions that have addressed downward departures based on lesser harms. Defendant, like the defendants in *Barajas-Nunez*, *Carvell*, and *Saldana,* believed that his choice to assist his brother in the escape attempt was a lesser harm than the devastating consequences to his parents's mental and physical well-being should they have discovered his brother's true sentence. Indeed, Defendant's fears have been realized in the death of his father, which directly followed his brother's death and his own incarceration. As noted by Dr. Hughes, Defendant's intense loyalties to his brother and his parents convinced him that he could help his family only by doing what his brother requested. While the reasons behind Defendant's choice does not excuse his conduct, the Court feels that they reduce, to some extent, the interest in punishment and deterrence, and thereby warrant a downward departure.

### C.    Post-Offense Rehabilitation

Extraordinary post-offense rehabilitation is an acceptable grounds for departure in the Tenth Circuit. *See United States v. Whitaker*, 152 F.3d 1238, 1240 (10th Cir. 1998). "The fact based assessment of whether [a defendant's] post-offense rehabilitation efforts are exceptional falls squarely within the realm of the district court's 'special competence.'" *United States v. Jones*, 158 F.3d 492, 503 (10th Cir. 1998). However, in this case, the Court cannot find Defendant's rehabilitation to be so extraordinary as to justify a downward departure.

Ironically, Defendant's exemplary record of charitable work and adherence to the law, as well as the numerous testimonials to his impeccable reputation in the community, actually prevent the application of this basis for a downward departure. There is simply nothing for Defendant to

-22-

rehabilitate.  Defendant's offense, though serious, was a clear aberration of an otherwise law-abiding life in which he greatly contributed to his community.  As a result, Defendant's post-offense conduct, which seemingly continues his previous commitment to obeying the law, cannot be characterized as extraordinary.

      D.      <u>Super-Acceptance of Responsibility</u>

 "Since a defendant's acceptance of responsibility is expressly accounted for under U.S.S.G. § 3E1.1, it is not a basis for departure unless the district court finds the acceptance of responsibility to be so exceptional that it is 'to a degree' not considered by U.S.S.G. § 3E1.1." *United States v. Gaither*, 1 F.3d 1040, 1043 (10th Cir. 1993).  The Court does not find Defendant's acceptance of responsibility to have been exceptional enough to warrant a downward departure; therefore, this ground is not a proper basis to depart from the sentencing guidelines.

      The Court recognizes Defendant's efforts to cooperate with the government and provide all of the information within his knowledge about the attempted escape.  As already discussed, the Court is troubled by the lack of investigation with regard to the information provided by Defendant.  This is especially true in light of the fact that Defendant's plea agreement with the government contemplated a downward departure for substantial assistance pursuant to Section 5K1.1 of the sentencing guidelines without any further benefit to Defendant.  Nevertheless, despite the Court's concerns, the investigation of this case and the use of Defendant's information are within the sole control of the government.  Had Defendant been given the opportunity to cooperate more extensively with the government, a finding of super-acceptance of responsibility might have been possible.  Since that opportunity never came into fruition, the Court cannot make such a finding.

E.     Lack of Personal Benefit

Defendant cites to *United States v. Walters*, 87 F.3d 663 (5th Cir. 1996), for the proposition that a lack of personal benefit can be a mitigating sentencing factor upon which a court may grant a downward departure.   The Fifth Circuit explicitly stated that a departure is permissible because Section 5K2.0 of the sentencing guidelines contemplates downward departures if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines."   87 F.3d at 671 (quoting 18 U.S.C. § 3553(b) (1994)).   Because "the sentencing guideline for money laundering and its commentary make no mention of the failure to receive a personal benefit as a mitigating factor," a departure was permissible. *Id.* at 671–72.   Although the *Walters* case concerned money laundering charges, it remains persuasive in this case because lack of personal benefit also is not mentioned in the charges against Defendant.

However, even though a downward departure based on lack of personal benefit is available, the Court does not believe it is appropriate in this instance because Defendant indubitably did gain some personal benefit from his offenses.   His participation in the charged offenses was motivated by his love for his family, and he would have benefitted from their improved welfare.   While one could argue that his actions were selfless, it cannot be doubted that he too would have benefitted from his brother's freedom and the knowledge that his family would be safe from harm.

F.     Community Support and Civic, Charitable, and Public Service

The Tenth Circuit expressly recognizes community service and strong support from the community as a permissible grounds for departure. *See Jones*, 158 F.3d at 500–01.   Because such

-24-

characteristics are discouraged factors under Sections 5H1.6 and 5H1.11 of the sentencing guidelines, they must be present to an exceptional degree in order to justify a departure.  *Id.*

Section 5H1.6 states in pertinent part that "community ties are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range."  USSG § 5H1.6. However, in *Jones*, the Tenth Circuit affirmed the district court's consideration of community support, in conjunction with other mitigating factors, when granting a downward departure based on twelve letters written by the defendant's community in his support.  *See* 158 F.3d at 500–01.  Of particular note is the Tenth Circuit's finding that the "basis of the departure . . . is not the victim's forgiveness, but [the defendant's] support in the community."  *Id.* at 501.

Civic and charitable service and record of prior good works are also considered by the sentencing guidelines in Section 5H1.11, which states that they "are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range."  USSG § 5H1.11. Because charitable works, like community ties, is a discouraged, but not forbidden, factor, it also must exist to an exceptional degree for a court to depart properly from the guideline range. Moreover, when engaging in the analysis of a defendant's prior good works, a "court should survey those cases where the discouraged factor is present, without limiting its inquiry to cases involving the same offense, and only then ask whether the defendant's record stands out from the crowd."  *United States v. DeMasi*, 40 F.3d 1306, 1324 (1st Cir. 1994) (citations omitted).

Many courts that address departures under Section 5H1.11 are concerned with the socioeconomic advantages of more privileged defendants, who have greater opportunities to participate in charitable works.  For example, the Third Circuit commented that since the defendant "is a wealthy individual, we must ensure that a district court does not run afoul of the prohibition

against considering socioeconomic differences in relying on financial contributions as a basis for a departure." *United States v. Serafini*, 233 F.3d 758, 775 (3rd Cir. 2000) (citations omitted). Likewise in *United States v. Crouse*, the Sixth Circuit believed that the defendant's church activities and service in community organizations did not support a departure because such "community works, while found to be significant by the district court, are not unusual for a prominent businessman." 145 F.3d 786, 792 (6th Cir. 1998); *see also United States v. Morken*, 133 F.3d 628, 630 (8th Cir. 1998) ("Although laudable, [the defendant's] record of good works is neither exceptional nor out of the ordinary for someone of his income and preeminence in a small Minnesota town . . . ."); *United States v. Haversat*, 22 F.3d 790, 796 ("It would appear that high-level business executives . . . also enjoy sufficient income and community status so that they have the opportunities to engage in charitable and benevolent activities.").

In stark contrast, Defendant is not a sophisticated businessman or professional of any kind. Rather, he is a simple farmer with nine years of education, who has lived in only two cities during his entire life—his hometown and the hometown of his wife, both of which have a population of approximately 7,000 people. Yet, despite such humble beginnings, his charitable works are truly exceptional, resulting in 164 letters of support from his community. In addition to operating his parents' farm located two hours away from his own, Defendant has volunteered to help a neighboring farmer with building irrigation canals—all with no payment in return. (PSR ¶ 76.) He was actively involved in church activities, including participation in youth groups and the assistance of impoverished and sick members of the church (R. at 402–03), and has worked on such community projects as remodeling the local Catholic church and the town square (Def. Ex. 46). Defendant served as a volunteer fireman and, with the Mayor and Secretary of his city, participated in the

purchase of a fire truck for his hometown.  (R. at 402.)  He was also a member of several civic

organizations, including the Cattlemen's Association, the Firefighters Association, and the Buena

Ventura Lions Club.  One elderly neighbor made the following comment about Defendant's good

works:

> I always noticed how Guero [the defendant] was helping his father on
> the farm and how he was always caring for them.  He would take
> them to the doctor.  He cared for his grandmother and his siblings.
> He has always been a good boy.  He had taken my wife and I to the
> doctor in Cuauhtemoc, Chih on occasion and he did it with pleasure.
> He has always liked to help others.

(Def. Ex. 94.)

The 164 letters in support of Defendant, in addition to an accompanying videotape of

testimonials, provide further grounds for departing from the guidelines.  While one court has noted

that "being a 'good person,' a quality indeed to be admired, does not qualify as extraordinary or

exceptional civic or charitable conduct" under Section 5H1.11, *Serafini*, 233 F.3d at 773, the Court

believes that such a quality is extremely relevant for a departure based on community ties under

Section 5H1.6, *see Jones*, 158 F.3d at 500–01.  One letter from the Legion of Mary Organization

states:

> He is a very dear person in this community, very kind to everyone,
> respectful, and very helpful with everyone.  For a period of time he
> was a member of our church choir in the community.  This was a
> group of young people who looked out for the needs of our parish.

(Def. Ex. 45).  Thirty-eight members of this organization, in addition to five of its officers, signed the

letter in support of Defendant.  In another letter, 114 members of the community signed a letter,

stating that they "are all lifetime neighbors of the Nava Sotelo family.  With regard to Mr. Adalberto

-27-

Nava-Sotelo, we can state that he's a good person, friendly, responsible, and has a very compassionate heart." (Def. Ex. 123.)

In nine years on the federal bench, the Court has never witnessed comparable support from a community and has never had a defendant with such an impeccable reputation or history of charitable service. What makes this Defendant even more remarkable is the fact that as a person with no grand ambitions or professional aspirations, he has made significant contributions to a small Mexican community. His contributions have made a tremendous impression on everyone around him. In the Court's opinion, Defendant's contributions to his community truly exemplify charitable and civic service at its best—not in exchange for recognition or some other rewards, but rather as a way of conducting one's life. It can be no coincidence that 164 authors of letters, in addition to 152 additional signatories, attest to Defendant's exemplary character and record of good works. The Court would like to believe that such community support is not extraordinary, but unfortunately, that is not the reality of the world we live in.

G.     Exceptional Remorse

In *United States v. Fagan*, the Tenth Circuit specifically recognized remorse as a permissible grounds for departure if it is present to an exceptional degree. 162 F.3d 1280 (10th Cir. 1998). The Court recognizes the remorse experienced by Defendant, as indicated by his statements following the victims' elocutions at the evidentiary hearing:

> I'm very sorry for what happened. Maybe your pain is much bigger than what we feel. And I would like to ask for 1000 apologies, and with all my heart, I hope that tomorrow, you will recuperate from all this trauma that you've gone through.

(R. at 690.)  The Court also notes that Defendant spent only one to two minutes with the victims (R. at 541) and that he did not learn the specific details of the victims' trauma until the evidentiary hearing (R. at 545).  Nevertheless, the Court cannot find Defendant's remorse to be extraordinary. This finding may be affected by the fact that Defendant was not able to cooperate with the government and the fact that Defendant lacked information about what had occurred to the victims. However, the burden rests with Defendant to demonstrate exceptional remorse, and that showing has not been made in this case.

H.    Totality of Circumstances

The Tenth Circuit recognizes departures based on a combination of factors, where the individual factors "are present to an exceptional degree."  *Jones*, 158 F.3d at 504–05.  The Tenth Circuit noted:

> The Sentencing Commission explicitly left open "the possibility of an extraordinary case that, because of a combination of such characteristics or circumstances [not ordinarily relevant to a departure], differs significantly from the 'heartland' cases covered by the guidelines in a way that is important to the statutory purposes of sentencing.

*Id.* at 504 (quoting USSG § 5K2.0 comment).  Based on a combination of family circumstances, incomplete duress, lesser harms, community support, and civic, charitable, and public service, the Court finds this case to be extraordinary and differing substantially from the heartland of cases, thus warranting a downward departure.

The government believes that Defendant "is attempting to invoke sympathy from the Court . . . , [and] [a]t every turn, . . . pulls on the heart stings [sic] . . . ."  (Gov's Opp'n to Def.'s Mot. at 1.)  The Court disagrees.  Defendant has merely provided substantial support for his contention that

-29-

his case is atypical of the heartland of cases, thereby requiring this Court to review all of the factors that possibly may be exceptional.  After extensive consideration of all of the evidence presented to the Court, including well over a hundred exhibits and three days of testimony, the Court has no doubt that this case is extraordinary.  All of the circumstances attendant to Defendant's participation in the offenses, as well as the devastating consequences on his family, make this case atypical and not within the ordinary purview of the sentencing guidelines.  The sentencing goals of punishment and deterrence, therefore, are not equally applicable in this case, as compared to more typical charges of assault and attempted escape.

In addition to explaining the grounds for a downward departure, the Court must also "specifically articulate reasons for the degree of departure using any *reasonable methodology hitched to the Sentencing Guidelines*, including extrapolation from or analogy to the Guidelines."  *United States v. Goldberg*, 295 F.3d 1133, 1138 (10th Cir. 2002) (citations omitted).  In this case, the Court has contemplated the guidelines' discouragement of using family circumstances, community support, and charitable activities as factors to be considered for departure purposes.  However, because the sentencing guidelines state that such factors are not "ordinarily" relevant, it is logical to presume that the guidelines foresaw the use of discouraged factors when they are extraordinary.  Furthermore, the guidelines expressly permit the consideration of encouraged factors, such as incomplete duress and lesser harms, when calculating a defendant's sentence.  Therefore, in exceptional circumstances such as the case before the Court, the guidelines clearly contemplate the permissibility of downward departures.

The guidelines do not, however, specifically delineate the proper method for determining the degree of departure, but rather state that the "decision as to whether and to what extent departure

-30-

is warranted rests with the sentencing court on a case-specific basis."  USSG § 5K2.0 (2001).  The Tenth Circuit has required a sentencing court to extrapolate from or analogize to the guidelines when determining the degree of departure without providing guidance as to how exactly this may be accomplished.  *See Goldberg*, 295 F.3d at 1138.  Moreover, a sentencing court may not justify a degree of departure "by referring to the resulting sentence rather than to an analogy to the Guidelines."  *Id.* at 1140.  Therefore, the Court cannot depart a certain number of levels to reach a specific sentence—for example, to avoid incarceration.

While not fully understanding what exactly constitutes a "reasonable methodology hitched to the Sentencing Guidelines," the Court has seriously studied and considered the basis purposes of criminal punishment as articulated by the guidelines.  The Court has weighed the goals of just punishment, deterrence, rehabilitation, and uniformity of sentences against the express contemplation of sentences "outside the range established by the applicable guidelines, if the court finds that there exists [a] . . . mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."  USSG § 5K2.0 (quotation marks omitted).  Thus, the Court has considered this defendant in comparison with the many other defendants sentenced before the Court, and agrees with the USPO's assessment that a six-level departure will incorporate all of the mitigating factors warranting a sentence below the guideline range, while properly maintaining the integrity of the basic purposes of criminal punishment.  It should be noted that even with a six-level departure, Defendant still faces a sentence of 121 months, which the Court believes to satisfy sufficiently the goals of punishment and deterrence for the crimes charged.

-31-

**CONCLUSION**

At the sentencing hearing conducted on October 21, 2002, the Court granted a two-level enhancement for reckless endangerment in the course of fleeing from law enforcement and a three-level enhancement because Defendant knew that the victims were correctional officers at the time of the offenses.  The Court denied a two-level reduction for minor role, but granted a six-level departure for a combination of exceptional mitigating factors, including family circumstances, incomplete duress, lesser harms, community support, and civic, charitable, and public service.  With a criminal history category I and an offense level of 21, Defendant faced a guideline range of 37 to 46 months.  The Court imposed a sentence of 37 months, as well as a seven-year consecutive sentence for brandishing a firearm, resulting in a final sentence of 121 months.

In this Memorandum Opinion, the Court has also made findings with regard to several factual statements in Defendant's PSR.

**IT IS THEREFORE ORDERED** that Defendant's PSR should be modified to reflect the following factual findings:

- El Guero and Robert Montoya are Defendant's only aliases;

- Defendant spent the evening of May 7, 2001, in Juarez, Mexico;

- Defendant did not pull Dr. Almeida out of the transport vehicle during the offenses;

- Defendant did not point his firearm toward the victims during the offenses; and

- the discharge of the firearm was accidental and involuntary.

**IT IS FURTHER ORDERED** that the PSR should include both the government's contention that Defendant ordered the victims to lie down in the transport vehicle after releasing his

brother and Defendant's version that he ordered them to throw their radio and keys on the ground,

and that his brother was the person who ordered them into the back of the vehicle.

      Dated this 1st day of November, 2002.

_____
MARTHA VAZQUEZ
UNITED STATES DISTRICT JUDGE

<u>Attorney(s) for Plaintiff(s)</u>:
Mark D'Antonio, Esq.

<u>Attorney(s) for Defendant(s)</u>:
Robert Kinney, Esq.